ORIGINAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUL - 7 2011

CLERK, U.S. DISTRICT COURT
By_____
Deputy

UNITED STATES OF AMERICA        §
                                §
v.                              §   CRIMINAL COMPLAINT
                                §
                                §   CASE NO. 4:11-MJ-232

                                §       11-109M
                                §
CRISTIAN OCANA,           (2)   §
a/k/a "Cri Cri"                 §
RIGOBERTO OROZCO,         (3)   §
a/k/a  "Rigo" and "Rigoberto Monrreal"  §
and "Jesse Monrreal"            §
WILLIAM GLENN JONES,      (4)   §
a/k/a  "Unc"                    §
WHEATTINA GOODMAN,        (5)   §
a/k/a  "Wheat"                  §
DAVEON McCULLOCH          (6)   §               FILED
LEDELL DERRICK SHAW       (7)   §
a/k/a  DERRICK SHAW             §          JUL 1 2 2011
KENYA WHITE,              (8)   §
a/k/a  "Block"                  §

U.S. DISTRICT COURT DISTRICT OF DELAWARE

## CRIMINAL COMPLAINT

I, Andrew D. Farrell, hereinafter Complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

From on or about May 25, 2005, and continuing until the date of this complaint, in the Northern District of Texas and elsewhere, defendants ███████████████ **Cristian Ocana,** also known as Cri Cri, **Rigoberto Orozco,** also known as Rigo, **William Glenn Jones,** also known as Unc, **Wheattina Goodman,** also known as Wheat, **Daveon Mcculloch, Ledell Derrick Shaw,** also known as Derrick Shaw, **Kenya White,** also known as Block, and others known and unknown, did knowingly and intentionally conspire, confederate and agree together and with other persons, not

named as defendants herein, to possess with intent to distribute and to distribute 500 grams or more of a mixture or substance containing Cocaine, a Schedule II, Controlled Substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).

All in violation of 21 U.S.C. §846.

1.      Complainant is a Special Agent of the FBI. I have been so employed for approximately twenty-six (26) years and am currently assigned to the Dallas Field Division's Fort Worth Resident Agency on a Criminal Enterprise Squad working with a Violent Crime/Gang Task Force (hereinafter referred to as the Task Force). The Task Force is comprised of Agents, investigators and police officers from the FBI, the Drug Enforcement Administration (DEA), the Arlington, Texas Police Department (APD), and the Fort Worth, Texas Police Department (FWPD).

2.      The statements contained in this Complaint are based, in part, on Title III interceptions, my personal observations and on information provided by other Special Agents of the FBI and DEA and officers of the Arlington Police Department, the Fort Worth Police Department, and other law enforcement agencies identified below. Statements herein are also based on information provided by cooperating sources, cooperating defendants in other related cases, all of whom are believed by me to be reliable and credible, as set out herein, officer's review of telephone toll records and pen registers, physical surveillance, police reports, and on my experience and training. In an effort to protect individuals not currently charged as a result of this or other investigations, these uncharged individuals will be referred to by their initials, rather than their full names. Additionally, in some instances, Confidential Sources (CS), Cooperating Defendants (CD), and Cooperating Witnesses (CW) will appear with a numerical designation which correspond to previous affidavits submitted in support of the applications for the T IIIs.

3.      Beginning in January 2007, investigators, assigned to the Fort Worth Criminal Enterprise Squad at the Fort Worth Office of the FBI including the Complainant, began an investigation into the criminal activities of the Fort Worth area Texas Syndicate. As the Texas Syndicate investigation progressed, Texas Syndicate member Danny Ramos became a target of the investigation. Investigators received information that Ramos was selling multi-kilo loads of cocaine, Ramos had a number of cocaine suppliers who were supplying him with the large kilo quantities of cocaine, and that Ramos had a black male customer from Atlanta, who was purchasing large kilo quantities of cocaine for cash. In November 2007, a courier of the Atlanta customer was interdicted in Atlanta with seven (7) kilos of cocaine. After the interdiction, Ramos' customer, **CD2**, was identified and began cooperating with DeKalb County HIDTA

investigators.

4.     In February 2008, Fort Worth FBI investigators traveled to Atlanta and debriefed **CD2**. **CD2** provided details of his cocaine dealings with Ramos and identified three (3) of Ramos' cocaine suppliers.

5.     **CD2** provided details of his cocaine dealings with Ramos and identified three (3) of Ramos' cocaine suppliers. One of the suppliers identified by **CD2** was **Rigoberto Orozco**. **CD2** and his courier, **Cooperating Witness (CW3)**, would drive from Atlanta to Fort Worth to purchase kilo quantities of cocaine. **CD2** would meet with Ramos and **Rigoberto Orozco,** count the money for the cocaine and hide the cocaine for the return trip. **CD2** first met Danny Ramos in 2003 or 2004. After meeting Danny Ramos, **CD2** began buying cocaine from Ramos. On **CD2's** second trip to Fort Worth, Ramos introduced **CD2** to **Rigoberto Orozco**, his source for the cocaine at that time. **Rigoberto Orozco** was supplying Ramos with cocaine until **Rigoberto Orozco** was charged because of the arrest of one of his couriers in Texarkana. **Rigoberto Orozco** then absconded and **CD2** believed that **Rigoberto Orozco** remained a fugitive.

6.     **CD2** started purchasing two (2) kilos per trip and later progressed to seven (7) or eight (8) kilos per trip. Later, **CD2** admitted that he was making two trips a month to purchase cocaine from Ramos in Fort Worth. During the time that **Rigoberto Orozco** was supplying Ramos, Ramos would front some of the cocaine to **CD2** and require payment for the rest. **CD2** would pay cash for the majority of the cocaine. **CD2** was making the trips to Fort Worth by himself during the time that **Rigoberto Orozco** was supplying Ramos. **CD2** never met **Rigoberto Orozco's** supplier. **CD2** stated that **Rigoberto Orozco** had called him on a few occasions. When **Rigoberto Orozco** called **CD2, Rigoberto Orozco** was generally inquiring about when **CD2** would be paying for the cocaine. Ramos and **Rigoberto Orozco** would generally give **CD2** a week to pay for whatever cocaine was fronted. **CD2** would generally pay for the fronted cocaine on his next trip to Fort Worth.

7.     After **CD2's** second purchase from Ramos, **Rigoberto Orozco** started coming to the deals with Ramos. **CD2** quickly learned that **Rigoberto Orozco** was the one with the cocaine connection and that Ramos worked for **Rigoberto Orozco** or **Rigoberto Orozco** supplied Ramos. **CD2** stated that **Rigoberto Orozco** and Ramos were arrested in Mississippi for a minor marijuana charge. **Rigoberto Orozco** and Ramos were driving a rental car back to Fort Worth from Atlanta, when they were stopped. **Rigoberto Orozco** and Ramos had collected drug money in Atlanta. **Rigoberto Orozco** deposited most of the money into a Bank of America account, but kept a couple thousand dollars with them. When they were stopped in Mississippi, the police found marijuana

seeds. They seized the money and took both men to jail. Both **Rigoberto Orozco** and Ramos spent a few days in jail. Investigators were able to confirm this information.

8.      During the time **CD2** was getting cocaine from **Rigoberto Orozco**, he would go to KF's mother's house to get the cocaine. KF was a girlfriend of Ramos and her brother, JPF, also supplied Ramos with cocaine. To start, **CD2** would get two to three kilos of cocaine from **Rigoberto Orozco** and Ramos. **CD2** would never get more than 5 kilos of cocaine at a time.

9.      After dealing with **Rigoberto Orozco** for a while, **CD2's** courier, **Cooperating Witness (CW) 3**, would travel to Fort Worth alone. **CW3** had two or three vans that they would use to run the drugs and money. They would typically hide both the drugs and money inside the hollowed out walls of a cooler. During the time that **CD2** dealt with **Rigoberto Orozco**, **CD2** believed that **Rigoberto Orozco** had customers in Pennsylvania, possibly Pittsburgh. **Rigoberto Orozco** asked **CW3** to drive ten (10) kilos of cocaine to Pittsburgh. **Rigoberto Orozco** was going to pay **CW3** $5,000 to drive the cocaine. **Rigoberto Orozco** and Ramos were supposed to follow **CW3** during the drive to Pennsylvania. **Rigoberto Orozco** wanted to sell the cocaine in Pennsylvania because he could sell it for a higher price. They were going to drop **CD2** in Atlanta and keep going to Pennsylvania. **Rigoberto Orozco** told them that a kilo of cocaine would sell for $25,000 to $26,000 in Pennsylvania. **CD2** believed that **Rigoberto Orozco** and Ramos had a black male customer in Atlanta. **CD2** described the customer as a tall black male. **CD2** did not know the customer's name. **CD2** had heard the name "Chris" or "Big C." **CD2** stated that Ramos made two trips to Atlanta for **Rigoberto Orozco**. Ramos would bring the money back to **Rigoberto Orozco** once the cocaine was sold. **CD2** thought that Ramos and Chris were making the trips for their own profit. **CD2** stated that **Rigoberto Orozco** and Ramos were big cocaine dealers, who could get up to 200 to 300 kilos of cocaine at a time.

10.     **CD2** had heard that one of **Rigoberto Orozco's** couriers had been arrested in Texarkana. Supposedly, a male and a female were delivering 7 kilos of cocaine for **Rigoberto Orozco**. The cocaine was hidden in the bed of a pick up truck. **Rigoberto Orozco** believed that the driver told on him. In response, **Rigoberto Orozco** sent a female relative to his house to pick up incriminating items, including money. The female also had kilo wrappers, which **Rigoberto Orozco** had told her to throw away. The police from the East Texas interdiction caught the female with these items. The female made a call to **Rigoberto Orozco** in an attempt to cooperate. **Rigoberto Orozco** did not fall for the attempt. **CD2** heard this story from both **Rigoberto Orozco** and Ramos. Again, **CD2** thought that **Rigoberto Orozco's** courier had been caught with 7 kilos. Afterwards, the police caught the female relative (known to the investigators to be Veronica Martinez).

11.    **CD2** estimated that he received a total of 250 kilos of cocaine from **Rigoberto Orozco**. **CD2** paid up front for some of the cocaine and **Rigoberto Orozco** fronted some of the kilos. **CD2** initially came to Fort Worth to pick up the cocaine. Eventually, **CW3** came by himself/herself to get the cocaine. **CD2** stated that **Rigoberto Orozco** would come to most of the deals. Ramos and **Rigoberto Orozco** would first count **CD2'** money. They would count the money by hand and with money counting machines.

12.    After learning of **Rigoberto Orozco's** identity and his role as a cocaine distributor to Ramos, investigators obtained Texas Department of Public Safety reports concerning **Rigoberto Orozco** and the interdiction of **Rigoberto Orozco's** courier, who was stopped by the Texas Department of Public Safety in Morris County, Texas, which led to the discovery of thirteen (13) kilos of cocaine hidden in the tailgate of the truck.

13.    As the Texas Syndicate investigation continued, a number of cooperating defendants provided information concerning **Rigoberto Orozco's** drug distribution activities. At the completion of the Texas Syndicate investigation, FBI investigators continued their investigation of **Rigoberto Orozco**.

14.    Independent of the Texas Syndicate investigation, in 2007, **Cooperating Source (CS) 5** began providing information to the Complainant concerning the Fort Worth area drug activity of Ramon Orozco, **Rigoberto Orozco's** brother. CS5 reported that Ramon Orozco was selling $20,000 worth of heroin a day in the North Fort Worth area and provided specific details of Ramon Orozco's activities, including the daily schedule of Ramon Orozco's couriers. The information regarding Ramon Orozco's drug activity was provided by the Complainant to the DEA, Fort Worth and DEA investigators initiated an investigation of Ramon Orozco's criminal activities. As a part of this DEA investigation, DEA investigators located and interviewed **CW4**, who had information of value on the illegal activities of both **Rigoberto Orozco** and Ramon Orozco.

15.    In 2008, **CD1** became a cooperating defendant in the FBI's Texas Syndicate investigation, an earlier FBI investigation into the illegal activities of the Texas Syndicate gang in the Fort Worth area. **CD1** provided reliable information in the past to agents of the FBI and DEA and has testified truthfully in federal court. **CD1** cooperated with investigators in an effort to reduce his sentence in the Texas Syndicate case. **CD1** has a past criminal history. **CD1** provided the investigators with details of his relationship with **Rigoberto Orozco**. **CD1** admitted that **Rigoberto Orozco** had been one of **CD1's** main cocaine suppliers. **CD1** has known **Rigoberto Orozco** since they were young and **CD1** began his relationship with **Rigoberto Orozco** by working for **Rigoberto Orozco**, delivering drugs, collecting money and providing protection for **Rigoberto Orozco** and

**Rigoberto Orozco's** drug deals. **CD1** went to prison in 1993. Later after **CD1** got out of prison in 2004, **CD1** began brokering cocaine sales from **Rigoberto Orozco** to **CD2** and other customers. **CD1** knew that **Rigoberto Orozco** had a number of "out of town" customers, including customers from Philadelphia, Pennsylvania. **CD1** estimated that **Rigoberto Orozco** moved thousands of kilos of cocaine.

16.     **CD1** described an incident which occurred when **CW3** had traveled to Fort Worth, Texas to pick up a load of cocaine for **CD2**. **CW3** and **Rigoberto Orozco** got into an argument and as a result, **CD2** and **CW3** would no longer deal with **Rigoberto Orozco**. **CD1** was with **Rigoberto Orozco** on May 25, 2005, when one of **Rigoberto Orozco's** couriers was caught with a shipment of cocaine in East Texas, as detailed above in Paragraph 12. A short time after the courier was caught with the cocaine, **Rigoberto Orozco** became more cautious while conducting his drug distribution and **CD1** began working with other cocaine suppliers. Because the information **CD1** provided has been corroborated by investigation, including telephone intercepts, and other cooperating defendants and cooperating sources, the Complainant believes **CD1** to be reliable.

17.     Independently, Fort Worth DEA investigators identified and interviewed **CW4**, who had information about the **Orozco Drug Trafficking Organization**. **CW4** had known **Rigoberto Orozco** and Ramon Orozco, and their brother, Jesse Orozco, since **CW4** was eight (8) years old. Jesse Orozco was the target of a DEA, Fort Worth investigation, which culminated with his arrest on September 28, 2007. As a result of the investigation, on July 16, 2008, Jesse Orozco entered a guilty plea and was sentenced to one-hundred-eight months in federal prison for Conspiracy to Distribute More than Fifty (50) Grams of Heroin. **CW4** first worked for **Ramon Orozco** selling heroin in the Fort Worth area. **CW4** later began to sell cocaine in Fort Worth. **CW4** provided details of **Ramon Orozco's** heroin distribution operation, which were similar to the details provided to the Complainant by **CS5**.

18.     **CW4** stated that while Ramon Orozco was in prison, Ramon Orozco's brother **Rigoberto Orozco**, used Ramon Orozco's drug connections and made their drug distribution business bigger and expanded it to the Atlanta, Georgia, and the Philadelphia, Pennsylvania area. **CW4** stated that when this happened, **Rigoberto Orozco** was running the business and traveling and living between Fort Worth, Atlanta, and Philadelphia.

19.     **CW4** said that after Ramon Orozco was released from prison in March of 2007, Ramon Orozco, **Rigoberto Orozco**, and another unknown individual visited **CW4** at his home and asked him if he was "ready to go to work," meaning ready to distribute drugs for them. **CW4** stated that he agreed to work. They told **CW4** to get his bags packed and they would get back in touch with him. **CW4** left for Atlanta and was picked

up by a black male, who introduced himself as **"Unc,"** who was later identified as **William Glenn Jones**. **CW4** stated that he and **Jones** then traveled to a condominium located on Lenox Avenue in Atlanta. According to **CW4, CW4** and **Jones** stayed at this condo owned by one of **Rigoberto Orozco's** cocaine customers, later identified by investigators as **Wheattina Goodman**. Investigators determined through records and contact with FBI and DEA investigators in Wilmington, Delaware that **Goodman** was a large scale cocaine distributor, who was previously convicted of smuggling cocaine from Houston, Texas to Wilmington, Delaware.

20.   **CW4** and **Jones** hung around the condo for approximately 4 days before **Rigoberto Orozco** arrived. **Rigoberto Orozco** told **Jones** and **CW4** that they could order anything they wished, but they could not go anywhere. **CW4** further stated that he carried a pistol at all times and that there were 3 pistols located at the condo. **CW4** also said that **Jones** carried one of the pistols as well.

21.   Two weeks after arriving in Atlanta, **Rigoberto Orozco** arrived at the condo and took **CW4** and **Jones** to a recording studio located a few minutes away. Once at the recording studio, **Rigoberto Orozco** told **CW4** to hang out with **Jones** because a shipment was coming in. **Rigoberto Orozco** drove across the street and took up a position in order to conduct surveillance on the delivery. According to **CW4**, at approximately 9:30 a.m., a FedEx truck arrived at the studio and delivered a large wooden crate. **CW4** signed for the crate, using the name "John Black." It took **CW4, Jones**, and the FedEx driver to get the crate out of the FedEx truck and into the studio. **CW4** was told by **Rigoberto Orozco** that the crates were shipped by FedEx, using a method known as "business to business" overnight, where the crates were shipped from one business to another. By shipping using this method, **Rigoberto Orozco** believed the crates would by-pass normal security and would not be subjected to normal security procedures. **CW4** did not know the originating address from where the crates were shipped. After the FedEx truck departed, **Rigoberto Orozco** waited a short period of time and then returned to the studio to check on the shipment.

22.   **CW4** said that he used a battery operated screwdriver/drill to open the crate. **CW4** located approximately 100 kilograms of cocaine in the crate. The cocaine was aligned in neat rows. Ceramic floor tiles lined the crate and had been placed between each row of bricks of cocaine. **CW4, Rigoberto Orozco** and **Jones** would count the kilos of cocaine and then move the cocaine to the condo. When the cocaine would arrive in Atlanta, **Rigoberto Orozco** would leave **Jones** and **CW4** in charge of the drugs.

23.   **CW4** also stated that when **Rigoberto Orozco** arrived at the studio, **Rigoberto Orozco** received a push-to-talk (PTT) call on his cell phone. **CW4** heard a

voice on the other end of the phone tell **Rigoberto Orozco** that the caller had received their package. As time wore on, **CW4** was told by **Rigoberto Orozco** that the calls confirmed that a similar shipment had arrived at it's destination in Philadelphia, Pennsylvania. **CW4** and **Jones** periodically traveled to the Philadelphia area to help **Rigoberto Orozco**.

24.    After receiving the shipment in Atlanta, **Rigoberto Orozco** would begin to call two (2) customers, named "J" or "Jay" (phonetic), and "Meece" (phonetic). Within minutes, the customers would arrive at the condo and pick up between 25 and 40 kilos of cocaine each. **CW4** said that within hours both customers, who were known to **CW4** as rap artists and producers in the Atlanta area, would return with large sums of U.S. currency. **CW4** would place the money into the crate, with a note attached to each stack indicating how much currency was in each stack. This procedure was repeated until all the kilos of cocaine were distributed and all of the proceeds from the sales had been collected. At the time of these deliveries in Atlanta, each kilo of cocaine was selling for $27,000. All of the cocaine would be distributed and all of the proceeds from sales would be received within 24 hours of the receipt of the shipment. **Rigoberto Orozco** would then count the money and place the money in two (2) large safes at the condo or take it from the condo and deliver it to a location, which was unknown to **CW4**. At this point **CW4** initially did not know what was happening with the money, but as he continued to work for **Rigoberto Orozco**, he learned more about the transactions.

25.    **CW4** stated that these shipments of cocaine continued for the next year, occurring once every 2 weeks. As time wore on, **CW4** learned that similar shipments were also being delivered to Philadelphia. Generally, the same amount of cocaine would arrive in both Atlanta and Philadelphia. Also, the same individuals would buy the cocaine and deliver the money.

26.    As time wore on, **CW4** began to develop higher positions of trust within the organization. **CW4** eventually learned that the name of the individual receiving similar shipments of cocaine in the Philadelphia area was an individual by the name "Mo," which **CW4** believed to be short for Maurice. Mo was later identified as MG, **Wheattina Goodman's** brother. **CW4** thought that the Atlanta condo had been purchased or rented in the name of MG's daughter.

27.    **CW4** eventually began to make trips to Philadelphia to help with the movement of money from a hotel in Philadelphia to Maurice Goodman's father's residence, which was located somewhere in Delaware. **CW4** stated that unknown individuals would bring him the money in the hotel. **CW4** would sit in the hotel with the money until it was transferred to the residence or it's final destination, which was

unknown to **CW4**. **CW4** added that on one of these occasions he was sitting in the hotel with over 3 million dollars. **CW4** was paid approximately $5,000.00 per trip to Philadelphia and the same amount for all trips, including trips from Fort Worth to Atlanta and Philadelphia. **Jones** would handle the deposits of the cash proceeds from the cocaine sales for **Rigoberto Orozco** and **Jones** would give **CW4** cash after making the deposits.

28.    **Rigoberto Orozco** told **CW4** that on one of his (**Rigoberto Orozco's**) trips to the Philadelphia area, **Rigoberto Orozco** was in the Delaware residence of Maurice Goodman's father with Maurice Goodman's daughter. **Rigoberto Orozco** was counting money when the front door of the residence was kicked in. A number of unknown individuals entered the residence, screaming "task force," as though they were police official raiding the residence. **Rigoberto Orozco** told **CW4** that he hid in a small downstairs corner along with the unknown female, later identified by **CW4** as **Wheattina Goodman**. One of the individuals located one of the bags of money **Rigoberto Orozco** was counting. The individual yelled that he had found the money and grabbed the bag. At that point **Rigoberto Orozco** began to think that the individuals raiding the residence were not law enforcement. **Rigoberto Orozco** said he pulled out a pistol and began firing at the individuals. **Rigoberto Orozco** believed he hit one of the robbers. One of the other robbers carried the wounded man and the bag of money out of the residence. On their next trip to Philadelphia, **Rigoberto Orozco** showed **CW4** the bullet holes in the wall where he (**Rigoberto Orozco**) shot at the intruders. **CW4** stated that they would count money from the sale of cocaine in the basement of **Goodman's** parents' Delaware house. **CW4** and the others would be at the house for twelve or fourteen hours straight counting money.

29.    **CW4** told investigators that **Rigoberto Orozco** had opened a Bank of America account specifically to send money to his wife Margarite Orozco, nee Monrreal, who resided in Mansfield, Texas. **CW4** said that **Rigoberto Orozco** would deposit drug proceeds, under $10,000, in order to avoid law enforcement attention. A female named NG would withdraw the funds in Fort Worth and deliver the money to Monrreal. **CW4** further stated that **Rigoberto Orozco** would pay NG $500.00 for each transaction she conducted for **Rigoberto Orozco**.

30.    **CW4** identified Daniel Ramos, one of the targets of the FBI's Texas Syndicate investigation, as one of **Rigoberto Orozco's** drug associates. **CW4** met Ramos in Atlanta on several occasions. Ramos knew **CW4** to be from Fort Worth. According to **CW4**, on one occasion Ramos confided in him that **Rigoberto Orozco** was under indictment by federal law enforcement. Investigators have confirmed that **Rigoberto Orozco** was charged in the Eastern District of Texas. Ramos warned **CW4** to be very careful working with **Rigoberto Orozco**.

31.    **CW4** stated that on several occasions he had helped **Rigoberto Orozco** count the money earned from the sale of cocaine. **Rigoberto Orozco** would buy suitcases or duffle bags to transport the money. **Rigoberto Orozco** would place the counted currency into the bags. **CW4, Rigoberto Orozco,** and **Jones** would use two (2) cars to take the money to a location picked out by **Rigoberto Orozco**. The location would usually be a truck stop or highway rest area. They would deliver the suitcases containing the currency to a driver of a truck. The truck driver would put the suitcases in the tractor part of the rig and depart. **CW4** stated that he did not know the destination of the truck with the currency.

32.    **CW4** had traveled several times with **Rigoberto Orozco** to Atlanta and Philadelphia. **CW4** added that **Rigoberto Orozco's** wife, Margarite Orozco, nee Monrreal, made all their travel arrangements and paid cash for the tickets. **Rigoberto Orozco** always traveled under a false name. **CW4** stated that **Rigoberto Orozco** would sometimes use his real first name and his wife's maiden name (**Rigoberto Monrreal**) or use the name of his wife's brother, JM.

33.    **CW4** said that he, along with Alex Last Name Unknown (LNU), who also went by the nickname "Chaparro," would transfer money via Western Union to un-recalled recipients. **CW4** stated that he and Chaparro used the same Western Union offices in Atlanta. **CW4** sent money to somewhere in the United States. Chaparro would send money to Mexico. **CW4** further added that one time he sent money by Western Union for **Rigoberto Orozco** from Philadelphia.

34.    **CW4** also said that **Rigoberto Orozco** had opened a bank account in the name of NG. On one occasion, **CW4** sent $2,500.00 via Western Union to NG. The money was intended for **Rigoberto Orozco's** wife, Margarite Monrreal. **Rigoberto** had been paying his wife's brother, JM, to use his identity for travel. **Rigoberto Orozco** had used this false name to travel to Atlanta.

35.    **CW4** stated that **Goodman** handled a lot of the money which came from the sale of the cocaine. **CW4** recalled that at the direction of **Rigoberto Orozco,** **Goodman** would drive money from the sales of the cocaine from Delaware to Atlanta and from Atlanta to Texas. **CW4** stated that **Goodman** would drive money and guns from Atlanta to Texas. Often times, **Goodman** would have her young niece travel with her while delivering the money and guns. **CW4** stated that **Rigoberto Orozco** would pay **Goodman** for each load of money she delivered. **CW4** recalled that **Goodman** would also carry between $50,000 to $70,000 on airline flights. With regard to the sale of the cocaine, **CW4** described **Goodman's** role as locating customers, who would purchase the cocaine from **Rigoberto Orozco**. **Goodman** would make connections between

Rigoberto Orozco and the customers, who would buy the cocaine. **CW4** recalled **Goodman** bringing customers to the Atlanta condo to buy the cocaine. **CW4** particularly recalled an incident when he, **Jones** and **Rigoberto Orozco** were in **Goodman's** Atlanta condo counting money from the sale of cocaine. **Goodman** had a key to the condo and **Goodman** and her niece walked into the condo. In addition to the money that the three men were counting, **CW4** stated that there were still unsold kilos of cocaine in plain view around the condo when **Goodman** walked into the condo.

36.     After **CW4** reported that the Atlanta condo used by **Rigoberto Orozco** was supposedly owned by a relative of Maurice Goodman, the investigators conducted a search of public records which led the investigators to believe that **Wheattina Goodman** owned the condo, located at 3047 Lenox Road, #1207, Atlanta, Georgia, which was used by **Rigoberto Orozco** to distribute the cocaine. Attempts by investigators to obtain FedEx records regarding the business to business shipments have failed. Investigators did locate bank records for an account in the name Naomi Garcia, which reflected deposits from Atlanta.

37.     **CS6** was developed in early 2008 by the FBI after **Rigoberto Orozco** attempted to travel from the Dallas/Fort Worth International Airport to Atlanta using false identification. At the time, **CS6** was very close to **Rigoberto Orozco** and was in a position to report on **Rigoberto Orozco's** activities. During interviews in February, March and April 2008, **CS6** reported that **Rigoberto Orozco** had established himself in Atlanta and other East coast cities, including Baltimore and Philadelphia, and **Rigoberto Orozco** was distributing large quantities of cocaine in these cities. **CS6** provided information to the FBI for fear that Margarite Monrreal, **Rigoberto Orozco's** wife, would get in trouble because of **Rigoberto Orozco's** drug activities. Information provided by **CS6** was corroborated through the review of telephone toll records and the debriefings of other sources. The Complainant believes the information provided by **CS6** to be credible.

38.     In January 2009, the Complainant began investigating the criminal activities of the **Orozco Drug Trafficking Organization (ODTO).** Based on a review of police reports and interviews with cooperating informants, cooperating defendants and arrested individuals, investigators determined that **Rigoberto Orozco** and Ramon Orozco were actively involved in various criminal activities in the Fort Worth, Texas area. The criminal activities for **Rigoberto Orozco** included the acquisition and sale of illegal narcotics, mainly cocaine, and the sale of the cocaine to customers, including customers outside of the state of Texas. The criminal activities for Ramon Orozco included the acquisition and sale of illegal narcotics, mainly heroin, and the sale of the heroin mainly in the Fort Worth area.

39.    Initial investigative efforts focused on developing information regarding the activities of the **Orozco** brothers.  Investigative efforts were later redirected to target the Sources of Supply for the drugs the **Orozcos** were selling.

40.    In September 2009, FBI investigators were contacted by the DEA's Fort Worth Resident Office regarding the **Orozcos**.  After this contact, the Fort Worth DEA and Fort Worth FBI began a joint investigation into the criminal and drug distribution activities of the **Orozcos** and their associates.

41.    Beginning in September 2010 and continuing until April 29, 2011, in an effort to obtain the necessary evidence to successfully prosecute coconspirators involved in the acquisition and distribution of illegal narcotics, Task Force investigators submitted ten (10) affidavits in support of applications seeking authorization to intercept or continue to intercept the wire communications of the cellular telephones (**Target Telephones or TT**) of targets of this investigation, including **William Glenn Jones, Rigoberto Orozco,** ███████████████████ and others.

42.    Beginning on March 19, 2010, the FBI, Thomasville Resident Agency of the Atlanta FBI Division, conducted interceptions of wire and electronic communications occurring on a Verizon Wireless cellular telephone assigned call number XXX-XXX-4081, a cell phone used by IC.  After determining that **Jones** was using **TT1**, the Complainant learned that **TT1** had been intercepted by FBI agents in South Georgia conducting court authorized interceptions of that cell phone.  Contact with the South Georgia FBI investigators determined that the cell phone was being used by IC, a cocaine distributor in that area.

43.    The monitoring of XXX-XXX-4081, used by IC, by the FBI in South Georgia, made it apparent that IC was utilizing additional telephones to facilitate his drug trafficking enterprise.  Investigation revealed that IC was previously using telephone number XXX-XXX-2273.  On March 30, 2010, IC was intercepted over one of his/her cell phone, directing members of his/her Drug Trafficking Organization (CDTO) to rendezvous with individuals believed to be affiliated with **Jones** and **Rigoberto Orozco** to pick up cocaine.  IC engaged in a series of calls in which he directed members of his/her DTO members to meet an individual on the side of the road.  A review of telephone records show that **TT1** and XXX-XXX-2273, communicated one hundred-sixteen (116) times, beginning on March 1, 2010, with the last call occurring on May 10, 2010.

44.    On May 25, 2010, the DEA, Savannah began the interception of wire and electronic communications occurring on cellular telephone XXX-XXX-6599, a telephone

utilized by BG, a cocaine customer of IC.

45.     On May 29, 2010 at 6:22 p.m., IC, using XXX-XXX-5077, was intercepted calling BG on XXX-XXX-6599. During a call intercepted by both the DEA, Savannah and the South Georgia FBI, IC told BG, a cocaine customer of IC, that his cell phone was broken. Also, after questioning by BG, IC told BG that his suppliers, believed to be **Jones**, told him the shipment of ten (10) kilos would arrive in the morning.

46.     Using calls between **Jones**, using **TT1**, and IC, the subject of a Thomasville, Georgia FBI T III, on Wednesday, September 15, 2010, Task Force investigators sought court authorization to conduct electronic surveillance of a cell phone used by **Jones**, 314-556-0997, **TT1**. On Friday, September 17, 2010, the Honorable Judge Terry R. Means signed the Title III application, affidavit and order authorizing the original interception of wire communications of **TT1**. Interception of the telephone calls began on Monday, September 20, 2010, at 9:15 a.m. The interception of **TT1** ceased on October 16, 2010.

47.     The interception of calls over **TT1** provided a broad view of the illegal drug activities of **Rigoberto Orozco** and **Jones**. **Jones** routinely talked with **Rigoberto Orozco**, who was using cellular number 817-538-0699 (**Rigoberto Orozco Cell 1**). The intercepted calls indicated that **Jones** and **Rigoberto Orozco**, using **Rigoberto Orozco Cell 1**, coordinated in-person meetings and calls on other cell phones, which were equipped with the PTT feature, including **TT2**. Continued attempts by investigators to identify the PTT cell phones being used by **Jones** and **Rigoberto Orozco** resulted in the identification of **TT2**. Intercepted calls between **Jones** and **Rigoberto Orozco** contained limited content concerning their dealings. Based primarily on the review of intercepted calls between **Jones** and other named and unnamed subjects, during which **Jones** discussed his illegal activities conducted with **Rigoberto Orozco**, investigators learned some details of the illegal activities. Intercepted telephone calls indicated that **Jones** had conversations regarding the acquisition of cocaine and marijuana from **Rigoberto Orozco**. Eventually, investigators intercepted **Jones** and **Rigoberto Orozco** using their PTT cell phones in the background of **Jones'** calls over **TT1**. During these background conversations, **Jones** and **Rigoberto Orozco** discussed in greater detail their illegal drug distribution activities. On October 16, 2010, investigators ceased monitoring **TT1**.

48.     On November 1, 2010, U.S. District Judge Terry R. Means of the Northern District of Texas, Fort Worth, Texas, signed an order authorizing the interceptions for a 30-day period of two (2) cell phone numbers used by **Rigoberto Orozco**, 817-819-8579, **TT2**, and 817-401-6465, **TT3**. Interceptions began on November 1, 2010. Investigators ceased monitoring **TT3** on November 15, 2010. Later, **Rigoberto Orozco** appeared to

stop using **TT2** after meeting in person with ███████████████ on November 23, 2010.

49.     The interceptions of **TT2** and **TT3** provided greater details of **Rigoberto Orozco's** and Ramon Orozco's drug trafficking activity with **Jones, Kenya White,** a Delaware cocaine customer, ███████████ and others. After **Jones** and **White** asked **Rigoberto Orozco** about the availability of drugs, **Rigoberto Orozco,** using **TT2,** would contact ███████ on **TT4** to determine whether the requested drugs were available. Also from calls intercepted on **TT2,** investigators learned that ███████ had supplied Ramon Orozco with heroin, while Ramon Orozco was in possession of **TT2,** which he had borrowed from **Rigoberto Orozco.** When Ramon Orozco failed to fully pay for the heroin, ███████ began to contact **Rigoberto Orozco** on **TT2** in an effort to get in touch with Ramon Orozco. **Rigoberto Orozco,** using **TT3,** would contact Ramon Orozco to ask Ramon Orozco to contact or pay █████████.

50.     On November 15, 2010, U.S. District Judge Terry R. Means of the Northern District of Texas, Fort Worth, Texas, signed an Order authorizing the interception of **TT4,** used by ███████ 310-803-3061 for a 30-day period. Interceptions began on November 15, 2010 and ended on November 28, 2010, when ███████ dropped this cell phone after observing surveillance units.

51.     The interceptions of **TT4** provided investigators with a large amount of information regarding ███████ attempts to meet **Rigoberto Orozco's** demands for cocaine, heroin and marijuana through a number of suppliers, including **Cristian Ocana.** Based on this information, investigators began attempts to identify additional members of the ███████ Based on ███████ past history of cell phone use, investigators anticipated that ███████ would quickly stop using **TT4** and on November 21, 2010, after twenty-five (25) days of use and six (6) days of interception, ███████ stopped using **TT4.** Investigators believed that on November 21, 2010, ███████ associates detected surveillance units which were attempting to observe the delivery of heroin from Manuel and Ramon Flores to ███████ Due to the short duration of **TT4** interceptions, many details concerning the ███████ remained unclear.

52.     From the interception of **Rigoberto Orozco's** cell phones, investigators knew that ███████ had brokered the sale of approximately one (1) pound of heroin from Manuel Flores to Ramon Orozco. When Ramon Orozco failed to pay for the heroin in a timely manner, ███████ would contact **Rigoberto Orozco** in an attempt to contact Ramon Orozco and ███████ would have frequent discussions with Manuel Flores regarding attempts to obtain payment for the heroin. Eventually, ███████

brokered the sale of the remaining supply of Flores' heroin to **Ocana**. Some of the activities surrounding this sale are detailed below in summaries of intercepted telephone calls to detail [redacted] use of **TT4** to communicate with Manuel and Ramon Flores and **Ocana** over **TT5**, prior to it's interception, to coordinate the sale and distribution of heroin.

53.     On September 20, 2010 at 4:54 p.m., **Jones**, using **TT1**, called XXX-XXX-4266, a Chicago area number, subscribed to and used by FT, who recently gave birth to **Jones'** son. After greeting, FT asked **Jones**, "So your friend's still playing, huh?" (Based on later calls, FT is commenting to **Jones** that **Rigoberto Orozco** still has not come through with the expected load of cocaine. **Jones** confirmed that he was still waiting for the load of cocaine from **Rigoberto Orozco**. **Jones** also commented that he had not heard from "Bowlen," who based on this and other calls had some involvement with a load of marijuana in Chicago. Investigators believe that "Bowlen" was involved with an earlier load of **Rigoberto Orozco's** marijuana in Chicago and Bowlen owed **Jones** money connected to the marijuana. FT and **Jones** discussed that someone stole an unspecified amount of money from **Jones**. From the call, FT knew about the incident and believed that the person used the money to maintain a relationship with his suppliers. **Jones** corrected FT and told her that did not happen. **Jones** also told FT that he would pay to retaliate against the person who stole the money. FT and **Jones** talked about two people not working as planned with **Jones**, including the person who stole the money in the Chicago area and **Rigoberto Orozco** in Texas. From this and later calls, investigators believe **Jones** was frustrated with **Rigoberto Orozco** for not delivering a load of cocaine to him as promised. **Jones** then told FT that another of his customers moved up to another supplier from his relationship with **Jones**.

54.     On September 20, 2010 at 11:08 p.m., **Jones**, using **TT1**, called telephone number XXX-XXX-0609 and talked to an unknown male (UM 1), who based on their conversation, was possibly a relative of **Jones**. After talking about **Jones'** new son, **Jones** told UM 1 that he was working on a situation, which had the potential to earn **Jones** and FT a lot of money. Investigators believe that this situation involved **Jones** establishing a new drug distribution relationship with **Rigoberto Orozco**. **Jones** also told UM 1 that he and FT had a good summer financially and enjoyed themselves. **Jones** and UM 1 also discussed the current nature of criminal gangs in Chicago. **Jones** told UM 1 that when he went to Chicago, he did not tell many people that he was there and he did not make himself visible, like he did previously. **Jones** commented that there was no leadership in the gangs and UM 1 replied that no one wanted to claim gang affiliation any more for fear that they will be targeted by the police. **Jones** told UM 1 that many gang leaders currently ran their criminal groups from outside of Chicago and never returned to Chicago. **Jones** however, claimed that he still owned an area in Chicago for criminal

purposes and could return if necessary. **Jones** complained that someone, possibly a Chicago area alderman, with whom **Jones** had a relationship, was recently arrested for trying to extort $20,000 from another businessman. Because of the arrest, **Jones** lost the advantage of his relationship with the man. **Jones** claimed that he would have given the man the money he took during the extortion.

55.     On September 22, 2010 at 12:16 p.m., **Jones**, using **TT1**, called 646-243-3109, a number associated by the Fort Worth and South Georgia investigators to **Derrick Shaw**, who had been surveilled by the South Georgia investigators making a delivery of drugs to IC. After greeting and discussing the possibility of **Shaw** moving to Texas, **Shaw** asked **Jones**, "What you...why you ain't stopped talking to the kid?" **Jones** replied, "I'm gonna see him, you understand, shit. I talk to him every day, every day." **Shaw** continued, "Hey man, you still recovering?" **Jones** answered, "Pretty much so." **Shaw** told **Jones**, "Golly. You been covering for a minute now, baby." **Jones** said, "Yea, take a lot out of ya." **Shaw** stated, "Yea, I know, I can dig it." (Investigators believe that **Shaw** and **Jones** are discussing **Jones** covering a drug debt for a common associate, possibly IC. **Shaw** asked **Jones** why he still talks to the associate. **Jones** says he talks to the associate every day and the debt was hurting him.)

56.     On September 23, 2010 at 12:27 p.m., **Jones**, using **TT1**, called 817-449-4829 and talked to **Daveon McCullough**. **Jones** asked, "Are you at home or at work?" **McCullough** replied, "At work." **Jones** then asked, "What time you get off?" **McCullough** answered, "Hopefully no later than 6:30 or 7:00, something like that." **Jones** commented, "Aww man that might be a little too late there you see what I'm saying. Hold one wait one minute, don't hang up." Beeping noises are overheard in the background along with voices. **Jones** continued, "Whenever you get the house call me man. If I can't figure out how to do this before you get home, you know what I'm saying, then I need to come by there." **McCullough** asked, "What you got going?" **Jones** replied, "Well it's hard to say. Whenever you get home call me, you know what I'm saying. If I can't figure how out how to handle this situation without waiting on you, I will do that. When you get home just call me." (Based on this and other calls, investigators believe that **Jones** is expecting a load of cocaine from **Rigoberto Orozco** and **Jones** is looking for a place to test the quality of the cocaine or to cook it into crack. **Jones** is asking **McCullough** when he will be home. When **McCullough** asked what **Jones** had going on, **Jones** tells **McCullough** that it was hard to explain.)

57.     On September 23, 2010 at 4:29 p.m., **Jones** received a call on **TT1** from IC, who was using XXX-XXX-3790. After greeting, IC told **Jones**, "I had got that thing I don't know, I put that little money on there, and uhm, got that number in here but right now it is saying ah Thursday they told me I probably got to wait about twenty minutes

before it gets back set again, that's what, that's what, when I put the minutes on, that's what they said." (IC is telling **Jones** he paid to put some minutes on one of his cell phones.) **Jones** replied, "Alright. Hey listen, text me, text that number. Alright, text me that number, you understand, because I did the other day, I ended up getting a new number because I really need to talk to you." IC agreed, saying, "Yeah, we need to talk bad. If you need to talk to me, I definitely need to talk to you." **Jones** continued, "Alright, text me the number now." IC replied, "Shit, I got to get my number then I got to go figure out what it is." **Jones** finished, saying, "Alright, do that as soon as you can man." IC replied, "Alright." (**Jones** is trying to get IC to text him the current cell number IC is using. IC does not know the number and must figure out the number. Investigators believe **Jones** could be trying to talk with IC regarding the expected shipment of cocaine from **Rigoberto Orozco**. When **Jones** told IC that he needed to talk to him, IC commented that if **Jones** needed to talk to him, then IC really needed to talk to **Jones**. Investigators interpret this comment to mean that IC is anxious to receive the shipment of cocaine.)

58.    On September 23, 2010 at 5:52 p.m., **Jones**, on **TT1**, receives an incoming call from 817-449-4829, used by **Daveon McCullough**. During the call, **Jones**, using code, told **McCulloch** that he was still waiting for a shipment of drugs from his supplier, **Rigoberto Orozco**. Ten minutes after this call, **Jones** placed an unanswered call to **Rigoberto Orozco**.

59.    On September 24, 2010 at 8:27 a.m., **Jones**, using **TT1**, called 817-449-4829 and talked to **McCulloch**. During this call, **Jones,** using heavily coded conversation, asked **McCulloch** whether he could use **McCulloch's** house to test the purity of an expected load of cocaine or cook the cocaine into crack. **McCulloch** agreed to allow **Jones** to use his house and also agreed to guide **Jones** into the house, since **Jones** was anxious to complete the work. **Jones** told **McCulloch** that the cocaine was not for sale in the Fort Worth area. Without prompting from **Jones**, **McCulloch** knew that **Jones** intended to take the cocaine to Atlanta. **Jones** told **McCulloch** that he had sent the mother of his child to meet one of **Rigoberto Orozco's** (described in the call by the nickname "Mansfield") couriers. **Rigoberto Orozco** had told **Jones** that the drugs, possibly marijuana described in another call, were high quality. The marijuana turned out to be poor quality. **McCulloch** told **Jones** that he needed to see **Jones** in person.

60.    On September 24, 2010 at 9:24 a.m., **Jones**, using **TT1**, called MS, **Jones'** friend from Atlanta with whom he discusses a wide range of criminal activities, on cell number XXX-XXX-7179. During the call, **Jones** and MS discussed **Derrick Shaw**. **Jones** said that **Shaw** owed **Jones** a buck eighty or what investigators believe to be $180,000. **Jones** said that **Shaw** played him for a buck eighty. **Jones** told MS that he

was going to get that buck eighty back from **Shaw**. **Jones** continued, saying without a doubt **Shaw** played him for a buck eighty. **Jones** said he had acquired some new information that let **Jones** know that **Shaw** played him for the money. Later, **Jones** and MS continued the call. MS said that **Shaw** was a mess. **Jones** told MS to play **Shaw** like a "mark." **Jones** told MS that **Shaw** needed MS more than MS needed **Shaw**. **Jones** again talked about **Shaw** "fucking" him out of the money. **Jones** talked about having to do a juggling act and having to disappear and reappear like a ghost in order to handle his drug distribution activities without **Shaw's** help. **Jones** said that **Shaw** previously told him that he was through with the drug business. **Jones** talked about having to do a deal without **Shaw's** help. **Jones** said that he had to come back down "here" to take care of work. After **Shaw** abandoned **Jones** and stopped helping **Jones** with his drug distribution, **Shaw** then asked **Jones** to "let him get a piece of it." Based on other intercepted calls, **Shaw** was overextended financially and wanted to return to the drug distribution activities. **Jones** told MS that he told **Shaw** that he put **Jones** in a precarious way with their drug distribution operation.

61.     On September 24, 2010 at 8:56 p.m., **Jones**, using **TT1**, called 817-449-4829 and talked to **McCulloch**. Prior to this call between 7:49 p.m. and 8:41 p.m., **Jones**, using **TT1**, placed four (4) unanswered calls to **Rigoberto Orozco** at 817-538-0699. After this call at 9:51 p.m., **Jones** placed another unanswered call to **Rigoberto Orozco** at 817-538-0699. After greeting, **Jones** asked **McCulloch** if he was at home or still working. **McCulloch** told **Jones** that he was at home. In response to **McCulloch** asking what he had going, **Jones** told **McCulloch** that he was planning to leave the Fort Worth area today, but the expected load of cocaine from **Rigoberto Orozco** (referred to by the nickname "Mansfield") had not arrived. **Rigoberto Orozco** has told **Jones** that he would have the drugs on two separate occasions. **McCulloch** agreed that **Rigoberto Orozco** has been telling **Jones** that he would have the drugs. Later, when **McCulloch** asked **Jones** whether **Rigoberto Orozco** has been able to do anything, **Jones** again told **McCulloch** that **Rigoberto Orozco's** cousin delivered a load of marijuana to Chicago and told him that it was high quality. **Jones** had his people look at it and the marijuana was only fair quality. **Jones** replied, "Well see here's the killing part, man…that the nigger is broke." **Jones** then details meeting **Rigoberto Orozco** at Denny's off of I-20. **Rigoberto Orozco** has his son with him and **Jones** picked up the check. **Jones** also told **McCulloch** that he met **Rigoberto Orozco** the other night and **Jones** had to again pay the check. **Jones** told **McCulloch** that **Rigoberto Orozco** had been saying that he was broke. **Jones** complained about paying for **Rigoberto Orozco's** meal at a Denny's. (This meeting at a local Denny's restaurant between **Jones** and **Rigoberto Orozco** had been surveilled by investigators.) **Jones** continued to discuss that **Rigoberto Orozco's** cousin delivered a load of marijuana to Chicago and told him that it was high quality. **Jones** had his people look at it and the marijuana was fair quality.

Jones told **McCulloch** that **Rigoberto Orozco** told him that the reason **Rigoberto Orozco** had not asked **McCulloch** to buy cocaine was because the price was $23,000 per kilo and **Rigoberto Orozco** did not think **McCulloch** would pay that price. **McCulloch** responded that he had discussed that price with **Rigoberto Orozco** and **Rigoberto Orozco** promised to call **McCulloch** back. **Rigoberto Orozco** never called **McCulloch** back and **Rigoberto Orozco** wouldn't give **McCulloch** his number, telling **McCulloch** to get it from **Jones**. **Jones** told **McCulloch** that if hadn't heard from **Rigoberto Orozco** by the morning, he will leave. **Jones** complained that he has been waiting too long and he had people waiting for the shipment. **Rigoberto Orozco** had given **Jones** the excuse of taking his children to football practice.

62.    On September 29, 2010 at 8:50 p.m., **Jones**, on **TT1**, receives an incoming call from 404-824-7179, a number subscribed to and used by MS. During the call with MS, which is partially minimized, a Push to Talk (PTT) alert or chirp can be heard. **Jones** asked MS not to hang up, and **Jones'** conversation on another phone, using the PTT feature, is overheard. **Jones** informed **Rigoberto Orozco** that he was leaving for Chicago early in the morning. **Jones** made reference to a "situation" in Chicago, believed by the investigators to be a load of **Rigoberto Orozco's** marijuana which was already in Chicago. **Jones** told **Rigoberto Orozco** that he was trying to arrange for the distribution of the load of marijuana in Chicago. **Jones** asked **Rigoberto Orozco** if **Jones** was able to get the deal arranged and sell the marijuana, whether **Jones** could keep the proceeds from the sale and apply it to what **Rigoberto Orozco** owed **Jones** in Texas. **Jones** again received a PTT call from **Rigoberto Orozco** during his call with MS and again **Jones** asked MS not to hang up. **Jones**, using the PTT feature, **Jones** again informed **Rigoberto Orozco** that he was leaving for Chicago early in the morning. **Jones** also told **Rigoberto Orozco** that he had the situation in Chicago under control. Also, **Jones** asked **Rigoberto Orozco** whether **Jones** could apply what he would make from the sale of the marijuana in Chicago against what **Rigoberto Orozco** owed **Jones** from Texas. **Jones** told **Rigoberto Orozco** that if the deal did not work out, then **Jones** would send it back to **Rigoberto Orozco**. **Jones** again asked **Rigoberto Orozco** to be prepared to make a phone call in the event that **Jones** could arrange for the sale of the marijuana. **Jones** told **Rigoberto Orozco** that he would be in Chicago for three days. **Rigoberto Orozco** told **Jones** he will wait on something regarding the marijuana. **Jones** told **Rigoberto Orozco** that while he was in Chicago, he would be looking for the male, possibly named "Dollar," who owed **Jones** for a past marijuana deal. **Jones** told **Rigoberto Orozco** that the male had been doing a number of different things and the male had not done anything wrong. **Jones** told **Rigoberto Orozco** that the last time the male handled something for **Jones**, the male ended up shooting someone and **Jones** had to rescue the male. The PTT portion of the call ended and **Jones** continued his call with MS. During the remaining portion of the call, **Jones** told MS, "I really need to get some face time with you, you understand,

because I need to be able to transfer some situations, uh, uh, to you." MS responded, "Yeah, yeah, yeah, yeah, yeah." **Jones** continued, "You understand what I'm saying?" MS responded, "Yeah, I got you." (Investigators believe that **Jones** intends to give whatever profit he makes from the sale of the marijuana supplied by **Rigoberto Orozco** and his supplier in Chicago to MS, so that he will not have to give any of the proceeds to his family. Based on a number of calls, **Jones'** family, particularly his mother, has been asking him for money to pay their bills.)

63.    On October 1, 2010 at 11:38 a.m., **Jones**, over **TT1**, received a call from 817-449-4829 and talked to **McCullough**. After greeting and discussing a number of topics, **McCullough** asked **Jones** whether **Rigoberto Orozco** ever came through with the promised load of cocaine. **Jones** told **McCullough** that **Rigoberto Orozco** was still talking about it, but he had not received the load. **Jones** told **McCullough** that he told **Rigoberto Orozco** that **Rigoberto Orozco** was holding him hostage based on **Rigoberto Orozco's** word or promise. **Jones** wanted **Rigoberto Orozco** to tell him the truth. **McCullough** agreed and said that **Rigoberto Orozco** should have the common courtesy to tell the truth. **McCullough** believed that **Rigoberto Orozco** was buying time. **Jones** told **McCullough** that **Rigoberto Orozco** has told **Jones** that he was broke.

64.    On October 4, 2010 at 2:31 p.m., **Jones**, using **TT1**, called XXX-XXX-4266, a Chicago area number, subscribed to and used by FT, the mother of **Jones'** new born child. After greeting and discussing **Jones'** return travel to Texas, FT asked Jones whether he told her that an unknown associate of **Jones**, who went by the street name, "the Gambler," was going to visit **Jones**. **Jones** confirmed that the associate (the Gambler) was planning to visit him in Dallas. **Jones** also told FT that he had wanted her to go by a look at something the Gambler had produced (believed by the investigators to be drugs). FT told **Jones** that he should have brought her some. Later, when FT asked **Jones** whether he had gotten in touch with another associate, **Jones** told FT that he had not and he may need her to put them in touch over a "two way" or phones with the PTT feature.

65.    On October 4, 2010 at 5:19 p.m., **Jones**, using **TT1**, called XXX-XXX-4266, a Chicago area number, subscribed to and used by FT. After greeting and discussing a number of matters, including Jones' location and travel, Jones told FT that the Gambler was trying to come down to Texas. **Jones** also told FT that he wanted to complete three deals at one time. **Jones** was concerned that his scheduled court hearing would interfere with the deals. FT told **Jones** that maybe the court would continue the case, allowing him to complete the three deals.

66.    On October 8, 2010 at 2:13 p.m., **Jones**, using **TT1**, called 229-375-3790, a

phone used by IC, the subject of the Thomasville FBI cocaine investigation. While the call to IC was connecting, **Rigoberto Orozco** was heard talking to **Jones** in the background of the call. **Rigoberto Orozco** said, "I ain't even ask for no money or nothin. First off, if me and you are going fifty - fifty (50-50) or not...I don't give a fuck... I don't give a fuck about it. I need some mother fucking cash more than anything. I ain't making shit off of it so I don't care." IC answered, "Hello." **Jones** responded by saying, "Hey Hey. Uh." IC interrupted, saying, "I been saying I miss ya." **Jones** continued, "Yea. I'm fixing to hit you on the other one." IC said, "Alright then." **Jones** finished, saying, "Alright." (Investigators believe that in the overheard portion of this call, **Rigoberto Orozco** was discussing the shipment of drugs to IC. **Rigoberto Orozco** discussed the fact that he and **Jones** were splitting the load, fifty-fifty. **Rigoberto Orozco** said he was not making any money on the deal, but he needed cash money. **Jones** then told IC that he would be calling him on the other number, believed by investigators to be a PTT phone.) In response to this phone call, investigators responded to the area where **Jones'** and **Rigoberto Orozco's** cell phones were located. Investigators located **Jones** and **Rigoberto Orozco** and conducted surveillance. **Jones'** Range Rover and **Rigoberto Orozco's** Honda were parked together along the curb in the 1800 block of Mistletoe Drive, Fort Worth, Texas. **Rigoberto Orozco** was observed sitting in **Jones'** Range Rover. **Rigoberto Orozco** remained in **Jones** car for approximately fourteen (14) minutes. As both men departed, they were observed by investigators talking on cell phones, which by the way they were being held could have been PTT phones.

67.    On October 11, 2010 at 5:04 p.m., IC, **Jones'** South Georgia cocaine customer, using cell number 229-375-3790, called **Jones** on **TT1**. During the call, IC and **Jones** discussed **Derrick Shaw**. IC told **Jones** that **Shaw** had come down to South Georgia for a gathering IC had put together. **Jones** laughed and asked IC what **Shaw** had to say. IC told **Shaw** that **Shaw** "didn't have anything to say." **Shaw** had asked IC what he had going and what he was up to. IC told **Shaw** that he was doing well. IC told **Jones** that he and **Shaw** had a conversation about what **Shaw** wanted to do with IC. IC described **Shaw** as shooting off this way and that way. Investigators believe that **Shaw** was attempting to re-connect with IC and offer to supply him with drugs. IC told **Jones** that when **Shaw** got back to Atlanta, he called and told IC that he had been talking to a few people on that end in an attempt to re-establish the drug supply. IC did not put much faith in **Shaw's** plans. IC also told **Jones** that he believed that **Shaw** was running low on money. IC and **Jones** believed that **Shaw** had spent a little more than he wanted to on a number of items. **Jones** told IC that **Shaw** was interested in moving his trucking business to Texas because Texas was a shipping hub. From this call, investigators believe that **Shaw** uses his trucking business for both legitimate and illegal purposes. **Shaw** wanted **Jones** to introduce him to some people who could help him get started in Texas. IC told **Jones** he wouldn't hook **Shaw** up with anybody because IC believed that **Shaw** would

turn back round and cross them out or double cross them. **Jones** told IC that **Shaw** couldn't cross them out in Texas.

68.     On October 12, 2010 at 8:57 p.m., **Jones** placed a call to XXX-XXX-4266 and he talked to FT. During the call, **Jones** told FT that based on his years of experience, he could tell that the drugs he had received from **Rigoberto Orozco** had been cut. FT asked **Jones** whether he should take the drugs to someone else to confirm his suspicions. **Jones** replied that he intended to take the drugs somewhere else that night. (**Jones** has received an unknown quantity of drugs from **Rigoberto Orozco** and he believes the drugs have been cut. **Jones** agrees with FT that he should have someone else look at the drugs to confirm his beliefs.)

69.     On October 15, 2010 at 9:48 a.m., **Jones** received a call from 817-449-4829. During the call, **Jones** asked **McCullough** whether "that fella" ever came by the house after **Jones** left. **McCullough** replied that the man had not come by and he was going to contact someone else on the South side, who would know someone who could look at the drugs. **Jones** told **McCullough** that he needed to know something today. (In response to **Jones** belief that the drugs he had received from **Rigoberto Orozco** had been cut, **Jones** arranged for someone else to look at the drugs. **Jones** is asking **McCullough** whether the person had come by **McCullough's** house to look at the drugs. **McCullough** tells **Jones** that the person had not come by and he intended to find someone else through his associates to come by and look.)

70.     On October 15, 2010 at 5:52 p.m., **Jones** received an incoming call from XXX-XXX-4266 and he talked to FT. During the call, **Jones** told FT that he was about to leave to visit **Rigoberto Orozco**. **Jones** also told FT that he knew from looking at the drugs that they had been cut and he complained that his customers would see the same thing he was seeing. Based on this and other calls, investigators know that **Jones** has received an unknown quantity of drugs from **Rigoberto Orozco**, that the drugs have been cut and that the presence of the cut is obvious. Even though the investigators were monitoring **TT1**, the details of the delivery of the drugs from **Rigoberto Orozco** to **Jones** and the type and amount of drugs were not clear. Investigators believe that these details were coordinated by **Rigoberto Orozco** using his PTT cell phone. **Jones** told FT that he was trying to complete a number of deals for different drugs. **Jones** told FT if he rejects the drugs he got from **Rigoberto Orozco**, believed to be cocaine, because the drugs have been cut then he will not be able to complete the transaction for those drugs. **Jones** wanted **Rigoberto Orozco** to commit to providing him with the drugs he needed. **Jones** was planning to visit FT and his son in Chicago. Because his supply of drugs from **Rigoberto Orozco** was uncertain at that time, Jones did not know where he would travel to next. **Jones** told FT that **Derrick Shaw** had called him and told him that he had a

supply of drugs available. **Jones** commented to FT that **Shaw** was ready to do something now that he had drugs available. **Jones** believed that **Shaw** was getting back into distributing drugs because of his financial obligations. FT told **Jones**, "Price counts." FT told **Jones** to put **Shaw** back to work. **Jones** told FT that he told **Shaw** to stay involved in the drug distribution but **Shaw** ignored **Jones'** advice, believing that he did not need to sell drugs any longer because of various business ventures. **Jones** commented that **Shaw** thought he could get by financially. **Jones** commented that he had opened a clothing store, but the clothing store did not work out. **Jones** told FT the he intended to "keep grinding" or selling drugs. The Complainant believes that **Jones** was frustrated with **Shaw** because **Shaw** had stopped helping **Jones** with his drug distribution for a period of time.

71.     On November 2, 2010 at 12:55 p.m., **Jones**, using **Jones PTT** called **Rigoberto Orozco**, over **TT2**. After greeting, **Jones,** who was in Chicago at the time, asked, "The question is what you doing, man. I've tried to call you the last couple of days. What's going on?" **Rigoberto Orozco** answered, "Aw, cause my brother had this phone. I let him borrow it cause he had to go do something and that bro was on the other line. And he didn't have time to go get him a phone. So I was like here take my phone. And I just got it back this morning. (From this and other intercepted calls, **Rigoberto Orozco** explained that he had given **TT2** to his brother, Ramon Orozco, because his brother was completing a transaction with ▮▮▮▮▮ and he didn't want to use his phone, which was saved in the phone book of the phone Eric Orozco was using at the time of his arrest in Houston.) **Jones** told **Rigoberto Orozco**, "I need you to call over there on 123rd street, man." (**Jones** is asking **Rigoberto Orozco** to check on the availability of drugs, using the code words "123rd street" for the drugs. Investigators believe that **Jones** is asking about cocaine.) **Rigoberto Orozco** replied, "I already called. There ain't nothin' around right now, but I'll call here in a minute to find out again." (**Rigoberto Orozco** telling **Jones** he had already checked and no drugs were available; **Rigoberto Orozco** will call again.) **Jones** stated, "So, so, I got this up here and them boys from Saint Louis comin' back. Where you at?" **Rigoberto Orozco** replied, "Oh, okay, okay. Uh, so, uh, them boys from Saint Louis what's goin on with them, what they need." **Jones** answered, "Uh, you know, they like them home grown collard greens." **Rigoberto Orozco** said, "Oh, okay, okay. Only that?" **Jones** answered, "Yeah, for right now, you understand, you dig. You know, they right close to me right now. You know, I'm just trying to see which way...the direction I got to go." **Rigoberto Orozco** replied, "Alright. Let me make a phone call or two. I'll hit you here in a minute to see what's up." (**Jones** has customers from Saint Louis with him in Chicago, who want to buy marijuana. **Rigoberto Orozco** asks if that's all they want and **Jones** affirmed. **Rigoberto Orozco** again tells **Jones** he will call his supplier to check. **Jones** advises **Rigoberto Orozco** that **Rigoberto Orozco's** answer will determine how he handles the Saint Louis customers.)

**Jones** continued, saying, "And definitely you understand on 123rd street. Cause I got a situation set up already." (**Jones** again asked **Rigoberto Orozco** to check on the availability of the cocaine because he already has a deal set.)

72.    On November 2, 2010 at 1:06 p.m., **Rigoberto Orozco**, using **TT2**, placed a PTT call to **TT4** and spoke to ████████████ The call was translated. After greeting and discussing the weather, **Rigoberto Orozco** told ████████████that he had received a call from **Jones** in Chicago inquiring about the one-hundred (100) pounds of marijuana. ████████████ answered that he would call to check on the marijuana. **Rigoberto Orozco** asked if the marijuana was unavailable in Chicago, whether ████████ ██████ had some available in Texas. The customers would then come to Texas to pick it up. ████████ said he would call to check on the availability and would call **Rigoberto Orozco** back.)

73.    On November 2, 2010 at 3:13 p.m., **Rigoberto Orozco**, over **TT2**, received a PTT call from 168*651*5044 and spoke to **Kenya White**, an associate of **Wheattina Goodman**. **White** asked **Rigoberto Orozco** about the availability of cocaine. **Rigoberto Orozco** told **White** that everything was good but **Rigoberto Orozco** was still waiting on what the two had previously discussed. **White** asked **Rigoberto Orozco** whether he was waiting on a load vehicle and **Rigoberto Orozco** responded that he was waiting on a driver, who would drive the load vehicle.

74.    On November 2, 2010 at 3:14 p.m., **Rigoberto Orozco**, over **TT2**, received a PTT call from 168*651*5044 and spoke to **White**. This call was a continuation of the previous PTT call. **White** told **Rigoberto Orozco** that he was willing to send a driver to pick up the load. **Rigoberto Orozco** asked whether the driver would fly to Texas. **White** said the driver would fly to Texas when **Rigoberto Orozco** had the cocaine available. **Rigoberto Orozco** confirmed if **White**'s worker was willing to drive the load car. **White** told **Rigoberto Orozco** that he was frustrated that **Rigoberto Orozco** won't come to Delaware or send a load of cocaine. **Rigoberto Orozco** had previously told **White** why he won't travel to Delaware. **White** agreed to check with the driver to ensure he was willing to drive the load car from Texas to Delaware. **Rigoberto Orozco** questioned how the driver would get to Texas and whether the driver would have his own vehicle or will use a vehicle provided by **Rigoberto Orozco**. **Rigoberto Orozco** was also checking whether the driver could drive a large vehicle, possibly an eighteen (18) wheeler, and how much the driver would charge to drive the load.

75.    On November 2, 2010 at 3:22 p.m., **Rigoberto Orozco**, over **TT2**, placed two (2) PTT alerts to **TT4**, which went un-answered. On November 2, 2010 at 3:22 p.m., **Rigoberto Orozco**, over **TT2**, received a PTT call from **TT4** and spoke to ████████████.

After greeting, [        ] believed that **Rigoberto Orozco** was again calling to determine the availability of cocaine for **Jones**. **Rigoberto Orozco** told [        ] that he wanted to ask about [        ] friend and whether he was still looking for a courier. [        ] told **Rigoberto Orozco** that he had not called his friend to ask whether the friend still needed a courier. **Rigoberto Orozco** told [        ] that he may have a courier, who was capable of driving a large vehicle, possibly an eighteen (18) wheeler. **Rigoberto Orozco** also told [        ] he will find out how much the driver will charge. [        ] advised he would call to see whether his friend is still looking for a driver.

76.     On November 2, 2010 at 3:48 p.m., **Rigoberto Orozco**, using **TT2**, placed a PTT call to 168*651*5044 and spoke to **White**. After greeting, **White** advised **Rigoberto Orozco** that **White's** driver was willing to travel to Texas to pick up the load of cocaine. **Rigoberto Orozco** asked whether the driver would bring their own vehicle. **White** advised that the driver would pick up **Rigoberto Orozco** and bring him back with the load. **Rigoberto Orozco** asked whether **White** asked how much the driver will charge. **White** told **Rigoberto Orozco** that he would be with the driver in the morning and they will discuss the price. **White** also asked whether **Rigoberto Orozco** will ride with the driver and **Rigoberto Orozco** tells him he will not ride to Delaware with the load. **White** believed that **Rigoberto Orozco** would want to keep a watch on the load of cocaine. **Rigoberto Orozco** told **White** that he has had too many close calls when watching loads. **Rigoberto Orozco** will let **White's** driver pick up the cocaine and bring it to **White**. **Rigoberto Orozco** asks whether they have their own vehicle and whether it is a large vehicle, possibly an eighteen (18) wheeler. **Rigoberto Orozco** told **White** that he has a vehicle ready. **Rigoberto Orozco** confirmed that he has a vehicle ready, which the driver can take to Delaware. **White** asks whether **Rigoberto Orozco's** vehicle was a regular car and **Rigoberto Orozco** confirmed that the load vehicle was a car. The call continued and **Rigoberto Orozco** and **White** discuss how long the drive would be from Delaware to Texas, the need to begin shipments again and alternate means to ship the cocaine. **White** also complained that **Rigoberto Orozco** had stopped shipments to Delaware. **Rigoberto Orozco** told **White** that **Goodman** had told him that **White** had another supplier arrangement and **Rigoberto Orozco** thought **White** didn't need his supply. **White** denied that he had something else going. When asked why he did not come to Delaware anymore, **Rigoberto Orozco** reminded **White** of the close calls he had during his last three trips. Later, **Rigoberto Orozco** again told **White** that **Goodman** told him that **White** had another supplier and **Rigoberto Orozco** then cancelled his supply route. Because the route was cancelled, **Rigoberto Orozco** was having a hard time re-establishing the route. **Rigoberto Orozco** and **White** agreed to talk the following morning.

77.    On November 3, 2010 at 12:51 p.m., **Rigoberto Orozco**, using **TT2**, placed a PTT call to 168*651*5044 and spoke to **White**. **White** told **Rigoberto Orozco** that the driver wanted a thousand dollars per kilo of cocaine in the load to drive the load vehicle. **Rigoberto Orozco** confirmed the price and **White** asked whether that price sounded right. **Rigoberto Orozco** told **White** that he would call his supplier to check and will call **White** back. **White** told **Rigoberto Orozco** he was sitting with the driver and he asked **Rigoberto Orozco** not to leave him hanging without an answer. **Rigoberto Orozco** told **White** he would call him back.

78.    On November 3, 2010 at 12:53 p.m., **Rigoberto Orozco**, over **TT2**, placed a PTT call to **TT4** and spoke to ▮▮▮▮▮▮ After greeting, ▮▮▮▮▮▮ told **Rigoberto Orozco** that he wanted to sell, but things were slow because it was too cold. **Rigoberto Orozco** told ▮▮▮▮▮▮ that no one stops with this cold weather.' ▮▮▮▮ told **Rigoberto Orozco** that it would get better this afternoon, and added that the sun will come out. **Rigoberto Orozco** agreed. **Rigoberto Orozco** asked ▮▮▮▮▮ whether he had called his friend to ask about how much he would be willing to pay the driver of the load of cocaine. ▮▮▮▮▮▮ told **Rigoberto Orozco** that he did call the friend, but the friend was busy. ▮▮▮▮▮▮ again agreed to call the friend. **Rigoberto Orozco** and ▮▮▮▮▮ then discussed cock fighting and whether **Rigoberto Orozco** wanted to enter some birds in a scheduled tournament. (Investigators were unable to determine whether **Rigoberto Orozco** and ▮▮▮▮▮▮ were truly discussing cock fighting or were using this as code to discuss illegal activity.)

79.    On November 3, 2010 at 1:03 p.m., **Rigoberto Orozco**, using **TT2**, placed a call to **Jones'** PTT cell phone. After greeting, **Jones** asked about the availability of cocaine in Chicago. **Rigoberto Orozco** told him that his supplier does not have any cocaine available right now. **Jones** told **Rigoberto Orozco** that he intended to leave Chicago that weekend. **Rigoberto Orozco** agreed to call the supplier and call **Jones** back.

80.    On November 4, 2010 at 6:50 p.m., **Rigoberto Orozco**, over **TT2**, received a PTT call from **TT4** and spoke to ▮▮▮▮▮ After greeting, ▮▮▮▮▮▮ asked whether **Rigoberto Orozco's** customers were still coming to pick up a load. **Rigoberto Orozco** questioned ▮▮▮▮▮ about whether he was talking about the customers for the hundred (100) pounds of marijuana. ▮▮▮▮▮▮ clarified that he was talking about the customer for the ten (10) kilos of cocaine. **Rigoberto Orozco** told ▮▮▮▮▮▮ that the cocaine customer has a driver and ▮▮▮▮▮ friend could ride back along with the cocaine. ▮▮▮▮▮▮ did not understand from the previous calls that the customer had a driver, who would drive the load to **White**. **Rigoberto Orozco** wanted to confirm that ▮▮▮▮▮▮ understood that **White** had a driver, but **Rigoberto Orozco** was not sure

whether the deal would be completed. **Rigoberto Orozco and** ▮▮▮▮▮▮ then discuss televisions available to **Rigoberto Orozco.** Later, ▮▮▮▮▮▮ asked **Rigoberto Orozco** whether Ramon Orozco has gotten PTT cell phone, because Ramon Orozco had not called ▮▮▮▮▮▮ Investigators believe that Ramon Orozco had borrowed **Rigoberto Orozco's TT2,** because Ramon Orozco felt his PTT cell phone could have been compromised by law enforcement after the arrest of his brother, **Eric Orozco.** **Rigoberto Orozco** told ▮▮▮▮▮▮ that he would ask Ramon Orozco to call ▮▮▮▮▮ ▮▮▮▮▮

81.    On November 9, 2010 at 12:47 p.m., **Rigoberto Orozco,** using **TT3,** placed a call to **Wheattina Goodman,** on cell number 302-290-6889. After discussing personal matters, **Rigoberto Orozco** said he ran out of minutes on his PTT cell phone and that he was about to go get some. **Rigoberto Orozco** said he called **Goodman** earlier. **Rigoberto Orozco** told **Goodman** that she never answers her phone. **Goodman** told him that she was at work and that was why she did not answer her phone. **Rigoberto Orozco** asked **Goodman** what she was doing. **Goodman** replied that she was chilling, waiting on **Rigoberto Orozco.** (**Goodman** was waiting on **Rigoberto Orozco** to begin supplying them again.) **Rigoberto Orozco** said he was waiting too. **Rigoberto Orozco** then said he talked to "Yo," a code name for **White. Goodman** replied that **White** told her. **Goodman** said they needed to talk about on that another line, their PTT cell phones. **Goodman** told **Rigoberto Orozco** to hit her up later.

82.    On November 9, 2010 at 1:50 p.m., ▮▮▮▮▮▮ , on **TT4,** placed a call to **Rigoberto Orozco** on **TT2. Rigoberto Orozco** asked ▮▮▮▮▮▮ about the availability of marijuana. ▮▮▮▮▮▮ asked whether **Rigoberto Orozco's** customer wanted regular quality marijuana or a higher grade. **Rigoberto Orozco** advised he would check. ▮▮▮▮▮▮ told **Rigoberto Orozco** that he would call someone and then call **Rigoberto Orozco** back.

83.    On November 9, 2010 at 1:56 p.m., **Rigoberto Orozco,** using **TT2,** placed a call to ▮▮▮▮▮▮ on **TT4. Rigoberto Orozco** said that he had another customer who is expected to arrive on Friday, November 12, 2010, who was looking for cocaine and who was willing to pay cash for five kilos. ▮▮▮▮▮▮ advised he needed to check on the availability. **Rigoberto Orozco** again asked about the availability of marijuana.

84.    On November 9, 2010 at 2:06 p.m., **Rigoberto Orozco,** using **TT2,** called ▮▮▮▮▮▮ on **TT4. Rigoberto Orozco** told ▮▮▮▮▮▮ that he had a customer, who will pay for a small sample and if the sample was good, the customer would buy a larger load. ▮▮▮▮▮▮ agreed that he could get the sample. ▮▮▮▮▮▮ asked whether the customer was with **Rigoberto Orozco** at that time. **Rigoberto Orozco**

replied that the customer will come in later, but an associate of the customer could look at the sample.

85.     On November 9, 2010 at 2:07 p.m., **Rigoberto Orozco** using **TT2**, called ███████ on **TT4**. **Rigoberto Orozco** asked for a sample of another type of drug, possibly heroin. ███████ asked whether **Rigoberto Orozco** can get the sample from Ramon Orozco. **Rigoberto Orozco** responded that he forgot that Ramon Orozco had some and he will ask Ramon Orozco.

86.     On November 9, 2010 at 5:44 p.m., ███████ using **TT4**, placed a call to **Rigoberto Orozco** on **TT2**. ███████ told **Rigoberto Orozco** that he had checked on the marijuana and, even though he did not know much about marijuana, learned that it had a lot of debris in it and it did not have a fresh smell. **Rigoberto Orozco** and ███████ agreed that the poor quality marijuana will not work for **Rigoberto Orozco's** customer. **Rigoberto Orozco** asked ███████ to look elsewhere since the customer will be in town.

87.     On November 10, 2010 at 4:42 p.m., **Jones**, using **Jones'** PTT cell phone, placed a call to **Rigoberto Orozco** on **TT2**. **Jones** confirmed with **Rigoberto Orozco** that the drugs ███████ looked at were poor quality. **Rigoberto Orozco** confirmed, but advised that ███████ was going to look at additional supplies. **Jones** asked which drug **Rigoberto Orozco** was talking about, the heroin (black) or the marijuana (collard green). **Rigoberto Orozco** confirmed that he was talking about the marijuana. **Jones** said his customer wanted both heroin and marijuana and if the customer liked the samples then **Jones** and **Rigoberto Orozco** will begin routine distribution of the drugs to the customer.

88.     On November 10, 2010 at 5:08 p.m., **Rigoberto Orozco**, using **TT2**, called ███████ on **TT4**. **Rigoberto Orozco** told ███████ that he was talking with his friend (**Jones**) and that **Jones'** customers wanted five of the kind my brother does (Ramon Orozco's usual drug, heroin). **Rigoberto Orozco** asked ███████ whether he could get the heroin for **Jones'** customer. ███████ said, "Yes, let me talk to this guy, all there is right now is the other half, but if he looks at it, we can order it, so it will be for sure." **Rigoberto Orozco** asked, "How long will it take if we order it?" ███████ told **Rigoberto Orozco** that it would take three or four days, because they only brought that one to see if [unintelligible] but if not, they weren't going to bring any more. **Rigoberto Orozco** told ███████ "Okay. It's a different guy, and if he likes it, we'll move ahead." (**Rigoberto Orozco** is telling ███████ that if the customer likes the heroin, they will begin routine sales to the customer.) ███████ said, "He can check the half, buy it and take it, and if he wants five then [unintelligible]. ( ███████ says



the customer can buy what he has now and them ▮▮▮▮▮ will be able to order five more units of the heroin.) **Rigoberto Orozco** asked the price for what ▮▮▮▮▮ had.

89.     On November 16, 2010 at 4:11 p.m., **Rigoberto Orozco**, using **TT2**, called ▮▮▮▮▮ on **TT4**. **Rigoberto Orozco** told ▮▮▮▮▮ that he needed a sample of heroin for a customer who will arrive next week. ▮▮▮▮▮ told **Rigoberto Orozco** that Ramon Orozco had some heroin and the customer can look at it with Ramon Orozco. **Rigoberto Orozco** asked ▮▮▮▮▮ whether he had talked to Ramon Orozco about the sample.

90.     On November 16, 2010 at 5:36 p.m., ▮▮▮▮▮, over **TT4**, continued a call with Manuel Flores, who was using PTT number ▮▮▮▮▮ for cellular telephone number ▮▮▮▮▮. Flores asked ▮▮▮▮▮ when they were going to the "shirts" place. This is one of the first calls intercepted over **TT4**. Investigators suspect that Flores is asking ▮▮▮▮▮ when they were going to pick up cocaine, described using the code word shirts, from one of ▮▮▮▮▮ suppliers. ▮▮▮▮▮ was referring to his efforts to collect payment from Ramon Orozco for heroin supplied by Flores. Ramon Orozco was not answering ▮▮▮▮▮ calls. ▮▮▮▮▮ told Flores that they could go the next day to pick up the cocaine and then go to visit Ramon Orozco. During the visit to Ramon Orozco, they could ensure that everything was okay with Ramon Orozco and that he had not been interdicted by law enforcement. Flores wanted ▮▮▮▮▮ to order some cocaine for him from the supplier. ▮▮▮▮▮ agreed and said that he had to pick up some kilos of cocaine, which were waiting for him with his supplier, who ▮▮▮▮▮ refers to as Azteca. Flores agreed and asked ▮▮▮▮▮ to call him to see what's up. ▮▮▮▮▮ affirmed. ▮▮▮▮▮ told Flores that the next day **Ocana** could be ready to purchase the remaining amount of heroin Flores has available. Flores said he had just ran out of the last unit of drugs and he wouldn't have any until the weekend. Flores sold his last amount of heroin and might get some more by the weekend. Flores told ▮▮▮▮▮ that he should have told him earlier that **Ocana** would be able to buy the heroin. ▮▮▮▮▮ says that **Ocana** had just called him and had not confirmed prior to that call. Flores told ▮▮▮▮▮ to let him know and added that this friend was coming to pick up some drugs from him. One of ▮▮▮▮▮ customers, **Ocana**, who had told him that he could not buy the heroin, has now told ▮▮▮▮▮ that he could make the purchase later. ▮▮▮▮▮ will tell the customer to wait. Flores said to tell him Saturday or Sunday, but yes, Flores will have the drugs available.

91.     On November 16, 2010 at 7:48 p.m., **White**, using 168*651*5044, called **Rigoberto Orozco** over **TT2**. After greeting, **White** asked **Rigoberto Orozco** whether he checked on the availability of an unknown drug. **Rigoberto Orozco** told **White** he

had some on hand but does not have a way to get it to **White** in Delaware.

92.     On November 16, 2010 at 9:14 p.m., **Rigoberto Orozco**, using **TT2**, called **Jones** on **Jones'** PTT cell phone. **Jones** asked, "What's going on man?" When **Jones** checked on an expected delivery, **Rigoberto Orozco** told **Jones** he was waiting, but he was going to get one unit of an unknown drug in a minute. Later, **Rigoberto Orozco** told **Jones** he was at his house.

93.     In anticipation of **Rigoberto Orozco** visiting **Jones** at his house, on November 16, 2010 at 9:40 p.m., surveillance was established in the vicinity of **Jones'** house, 7020 Misty Meadows Drive South, Fort Worth, Texas. At 10:20 p.m., **Rigoberto Orozco** arrived driving his Honda Accord. **Rigoberto Orozco** parked in front of **Jones'** house, turned on the Accord's interior overhead dome light, and was observed retrieving a white plastic bag from the front passenger area. At 10:23 p.m., **Jones** was observed exiting his house and entering the front passenger seat of **Rigoberto Orozco's** Accord. While the dome light was still on, **Rigoberto Orozco** was observed passing the white plastic bag to **Jones** and **Jones** was observed inspecting the contents of the bag. After **Jones** inspected the contents, the dome light was turned off. At 10:54 p.m., **Jones** exited car and went into his house. **Rigoberto Orozco** then departed the area.

94.     On November 17, 2010 at 10:53 a.m., ███████████ using **TT4**, called **Rigoberto Orozco** on **TT2**. ███████████ had information on hydroponic marijuana, which was priced at $3,900 per pound. **Rigoberto Orozco** confirmed that ███████ was talking about hydroponic marijuana or "OG Kush," a certain brand of hydroponic marijuana. ███████████ confirmed that the available marijuana was hydroponic marijuana, but he cannot explain why the price was set at $3,900.

95.     On November 17, 2010 at 7:27 p.m., **Rigoberto Orozco**, using **TT2**, called ███████████ over **TT4**. ███████████ initially asked **Rigoberto Orozco** to see whether Ramon Orozco was bringing ███████ the money he owes him for heroin. **Rigoberto Orozco** advised ███████ that he had just talked to Ramon Orozco and learned that he was en route to see ███████ **Rigoberto Orozco** asked ███████████ about the sample of marijuana he had requested. ███████████ advises that he was waiting for the load to arrive and would call **Rigoberto Orozco** once it arrived.

96.     On November 18, 2010 at 11:43 a.m., ███████████, using **TT4**, contacted **Ocana** on **TT5**. After greeting and discussing an issue **Ocana** was having regarding the transfer of a truck title, ███████ said that he just had a call from the other friend about whom he and **Ocana** talked yesterday. ███████████ reminded **Ocana** about the



"photo" **Ocana** gave ████████ **Ocana** said it is "OG Kush" and that was why it was so expensive. **Ocana** said that he saw the marijuana yesterday and there was very little of it. ████████ asked if there was any "regular." **Ocana** said no. ████████ will call his friend. **Ocana** reiterated that it was "OG Kush." (████████ tells **Ocana** that he had received a call from his customer, **Rigoberto Orozco**, who ████████ had discussed with **Ocana**. ████████ reminds **Ocana** about the sample he had received from **Ocana**. **Ocana** tells ████████ that he had seen the marijuana the previous day and there was a little left. **Ocana** also confirms that it is OG Kush, a high grade hydroponic marijuana, which explained why the price was so high per pound.)

97.    On November 18, 2010 at 11:44 a.m., ████████, on TT4, placed a call to **Rigoberto Orozco**. ████████ said that the marijuana supplier (**Ocana**) said that the one that is expensive is OG Kush (a high grade marijuana). The supplier told ████ that there was no regular left. **Rigoberto Orozco** asked how much and ████ said 38 ($3,800 per pound). **Rigoberto Orozco** asked if the supplier had any regular marijuana. ████████ tells **Rigoberto Orozco** that the supplier said all the regular marijuana was gone. ████████ continued, saying the supplier said he is waiting on a decision from **Rigoberto Orozco** and ████████ did not tell him anything. ████████ said the supplier just now called him and the supplier told ████ to offer him (**Rigoberto Orozco**) "the OG...OJ Kush or something like that." **Rigoberto Orozco** asked if there were several pounds of the OG type and ████████ answered yes, the supplier said he did have plenty but he was getting rid of it quickly. ████████ said that his friend said that the OG stuff was great. At 11:54 a.m., **Rigoberto Orozco** told ████████ to talk to his friend and see how much ████ ████████ friend was going to ask for these if **Rigoberto Orozco's** friend bought a few of them. ████████ asked how much. **Rigoberto Orozco** says the guy wanted 100 dollars of the other. **Rigoberto Orozco** asked how much would that be... they are going to want about... **Rigoberto Orozco** said hold on  and the call ended.

98.    On November 18, 2010 at 11:58 a.m., ████████ using TT4, contacted **Ocana** on TT5. ████████ asked if **Ocana's** friend had a lot of the hydroponic marijuana. **Ocana** said the friend had "one hundred (100)." ████████ asked the best price that friend was willing to give. **Ocana** said that this was the best price. The supplier was not going to go down and it was "3500 ($3500 per pound for the marijuana). ████████ said he thought "they will take 20 to 30 now." **Ocana** asked ████████ to check with his customers. ████████ said, "if it was a done deal, then he will he will let them know his (**Ocana's**) number, so **Ocana** and the others could handle it themselves." **Ocana** asked if the guy was trustworthy. ████████ affirmed, telling **Ocana** not to worry. ████████ said "he was telling the guy 3 8, so that he ████ ████████ and others get 3 out of it." **Ocana** agreed. (████████ and **Ocana** discuss

adding to the cost from the supplier so they can make something on the deal.)

99.   On November 18, 2010 at 12:09 p.m., ▓▓▓▓▓▓ using **TT4**, called **Rigoberto Orozco** on **TT2**. **Rigoberto Orozco** asked if ▓▓▓▓▓▓ friend (**Ocana**) has the OG (the investigators believe that **Rigoberto Orozco** is referring to high grade marijuana) because that's what they needed in Chicago and Atlanta. ▓▓▓▓▓▓ said his friend (**Ocana**) has nothing to send there. ▓▓▓▓▓▓ told **Rigoberto Orozco** to check and see if they can do something about it. **Rigoberto Orozco** said the guy (**Rigoberto Orozco's** customer) was going to do something and buy the other stuff since there is no regular. **Rigoberto Orozco** said the guy should call soon. ▓▓▓▓▓▓ said he was going to give **Rigoberto Orozco** the number (to **Ocana**) so **Rigoberto Orozco** can handle this directly. ▓▓▓▓▓▓ told **Rigoberto Orozco** that **Rigoberto Orozco** will end up going to an office. ▓▓▓▓▓▓ asked if **Rigoberto Orozco** wanted the number now and **Rigoberto Orozco** said to wait until his customer lets him know amounts. (**Rigoberto Orozco** asks ▓▓▓▓▓▓ about the availability of marijuana for customers in Chicago and Atlanta. ▓▓▓▓▓▓ supplier, **Ocana**, has nothing to send and ▓▓▓▓▓▓ asks whether the customers can come to Texas. **Leon-Vargas** plans to give **Rigoberto Orozco** the number for **Ocana** so he can call directly. **Rigoberto Orozco** tells ▓▓▓▓▓▓ to wait to give him the number until the customer tells **Rigoberto Orozco** how much he wants.)

100.   On November 18, 2010 at 6:46 p.m., **White**, using 168*651*5044, called **Rigoberto Orozco** over **TT2**. After greeting, **Rigoberto Orozco** told **White** that he had some high grade (OG) marijuana he planned to send to **White**. **White** clarified that **Rigoberto Orozco** was talking about marijuana and asked the price. **Rigoberto Orozco** told **White** he would call him back.

101.   On November 20, 2011, based on the cell tower information for **Rigoberto Orozco's** cell phone, investigators believe that **Rigoberto Orozco** traveled to Grand Prairie, Texas to purchase the high grade marijuana from **Ocana**.

102.   On Sunday, November 21, 2010, ▓▓▓▓▓▓ stopped using **TT4** immediately after the individuals in the Ford van identified surveillance units. Based on intercepted calls over **TT2**, **TT3** and **TT4** and surveillance, investigators believe that surveillance units were observed on Sunday, November 21, 2010. In response, ▓▓▓▓▓▓ ▓▓▓▓▓▓ stopped using **TT5** and ▓▓▓▓▓▓ advised **Rigoberto Orozco** to stop using **TT3**. **Rigoberto Orozco** then contacted **William Jones** and advised him to stop using the PTT cell phone with which he communicated with **Rigoberto Orozco**. Investigators later reviewed evidence which indicated that ▓▓▓▓▓▓ wife, GT, drove someone, possibly ▓▓▓▓▓▓ to the U.S. Mexican border on November 22, 2010, the day after

██████████ observed surveillance.

103.   On November 22, 2010 at 9:32 p.m., **Rigoberto Orozco**, using **TT2**, placed a PTT call to **Jones** on **Jones'** PTT cell phone. After greeting, **Jones** asked **Rigoberto Orozco** about the expected load of marijuana from ██████████ **Rigoberto Orozco** told **Jones** that ██████████ had not called him back and ██████████phone was off. **Rigoberto Orozco** asked Jones how much marijuana he wanted. At 9:34 p.m., in a continuation of this PTT conversation, **Jones** told **Rigoberto Orozco** that he needed at least ten (10) pounds of marijuana.

104.   On November 23, 2010 at 12:44 p.m., **Rigoberto Orozco**, using **TT2**, placed a PTT call to **Jones** on **Jones'** PTT cell phone. After greeting, Jones again inquired from **Rigoberto Orozco** about the expected load of marijuana from ██████████ **Rigoberto Orozco** answered that ██████████ phone was still off, that he believed the load was going to happen and **Rigoberto Orozco** was going to see ██████████ in person.

105.   On November 23, 2011 at 2:28 p.m., investigators observed **Rigoberto Orozco's** tan 2004 Honda Accord, arrive at Ceyala Beer, 2320 Riverside Drive, Fort Worth, Texas, 76103. Investigators observed **Rigoberto Orozco** exit the driver's seat of the vehicle, approach the front of the business, where he was met by ██████████. Investigators observed **Rigoberto Orozco** and ██████████ stand in the parking lot of the business and talk. At 2:40 p.m., investigators observed **Rigoberto Orozco** and ██████ ██████ walk away from each other, with **Rigoberto Orozco** walking over by his vehicle and ██████████ walking towards the front of the business. After approximately one minute, **Rigoberto Orozco** and ██████████ walked back towards each other in the parking lot and continued their conversation. At 2:51 p.m., **Rigoberto Orozco** and ██████ ██████concluded their conversation. Investigators observed **Rigoberto Orozco** get into the driver's seat of his 2004 Honda Accord, while ██████████ walked back into the business. Investigators believe that██████████warned **Rigoberto Orozco** that his associates had observed surveillance units on November 21, 2010 and advised **Rigoberto Orozco** to change his cell phone number.

106.   On November 24, 2010 at 4:09 p.m., **Rigoberto Orozco**, using **TT2**, placed a PTT call to **Jones** on **Jones'** PTT cell phone. **Jones** asked **Rigoberto Orozco** why he had not called him back about an expected shipment of drugs for one of **Jones'** customers, who will arrive on Friday. Rather than talk over **TT2**, **Rigoberto Orozco** requests that **Jones** meet him in person.

107.   On November 24, 2010, investigators observed a meeting where **William**

**Jones** traveled to meet **Rigoberto Orozco** at his Mansfield, Texas residence. After this meeting, both **Rigoberto Orozco** and **Jones** stopped using their known cell phone numbers. Investigators believe that during the meeting with ████████ detailed above, that ████████ warned **Rigoberto Orozco** about the surveillance units. In response, **Rigoberto Orozco** warned **Jones** and both **Rigoberto Orozco** and **Jones** changed their cell phone numbers.

108.    Based on the foregoing, the Complainant believes that probable cause exists that ████████████████████████████████████████████████████████ ████████ **Cristian Ocana**, also known as Cri Cri, **Rigoberto Orozco**, also known as Rigo, **William Glenn Jones**, also known as Unc, **Wheattina Goodman**, also known as Wheat, **Daveon McCulloch**, **Ledell Derrick Shaw**, also known as Derrick Shaw, **Kenya White**, also known as Block, and others known and unknown, have committed offenses involving violations of Title 21, United States Code, Section 841(a)(1)(Possession of a Controlled Substance with the Intent to Distribute); United States Code, Section 846 (Conspiracy to Possess with Intent to Distribute a Controlled Substance); and Title 18, United States Code, Section 2 (Aiding and Abetting the above-described offenses)

_____
Andrew D. Farrell, Special Agent,
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence, July **7**th, 2011, at Fort Worth, Texas, at **3:07** o'clock, p.m.

_____
HONORABLE JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE